UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 16-cr-170 (MJD/LIB) |
| Plaintiff, | |
| v. | **ORDER AND** |
| | **REPORT AND RECOMMENDATION** |
| Damien Charles Jones, | |
| Defendant. | |

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1) and Local Rule 72.1, upon Defendant Damien Charles Jones's ("Defendant") Motion for Disclosure of Informants, [Docket No. 21]; upon Defendant's Motion to Suppress Searches and Seizures, [Docket No. 22]; and upon Defendant's Motion to Suppress Statements. [Docket No. 23]. The Court held a motions hearing on August 29, 2016, regarding the parties' pretrial motions.[1] The parties requested an opportunity to submit supplemental briefing which was completed, and the motions were then taken under advisement on September 15, 2016.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 22], be **DENIED**, and that Defendant's Motion to Suppress Statements, [Docket No. 23], be **DENIED**.

For the reasons discussed herein, the Court **GRANTS in part and DENIES in part** Defendant's Motion for Disclosure of Informants. [Docket No. 21].

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 33].

I.      **BACKGROUND AND STATEMENT OF FACTS**

**A.  Background**

Defendant is charged with one (1) count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment [Docket No. 1]).

**B.  Facts**

On March 29, 2015, Red Lake Police Officer Joseph Edward Heyer ("Officer Heyer") drafted an application for a Tribal warrant to search the premises described in the warrant and to arrest Defendant. (Gov't Ex. 1).[2] That warrant application contained the application itself and four attachments. (Id.). Attachment A contains the description of the residence to be searched. (Id.).[3] Attachment B describes the places to be searched and the items for which the warrant sought to search. (Id.). Attachment C is Officer Heyer's affidavit in support of the March 29, 2015, warrant application. (Id.). The fourth attachment is a copy of a then active federal arrest warrant for Defendant.

The application for the warrant asserted that it was necessary in order to search for evidence of a crime, contraband, fruits of crime, or other items illegally possessed; property designated for use, intended for use, or used in committing a crime; and a person to be arrested. (Id.). Officer Heyer attested that the application was based on the facts in Attachment C.

Attachment C outlined Officer Heyer's qualifications, and it provided the facts upon which he based his warrant application. (Id.). Officer Heyer noted that the information contained in his affidavit was based on his personal knowledge as well as information provided to him by

---

[2] Government's Exhibit 1 is the warrant application, supporting documents, and March 29, 2015, warrant now at issue. At the motions hearing, the Government, without objection, offered the warrant application, supporting documents, and warrant as Government's Exhibit 1.

[3] The residence to be searched was described as the Josh Roy-Felicia Hanks Residence; 2nd on the Right New South McBride's Neighborhood; Single Level House with a white car in the Driveway; Redby, MN 56670.

other law enforcement officers and individuals. (Id.). Officer Heyer attested that he was advised that Defendant resided with Josh Roy and Felicia Hanks in the McBride's neighborhood of the Redby District. (Id.). Officer Heyer further attested that on March 20, 2015, he was advised "by family" that Defendant had a "federal warrant," and that Defendant as well as his girlfriend, Carol Graves, were selling narcotics out of a side window of the identified residence. (Id.). On March 24, 2015, Officer Heyer was further advised "by a concerned citizen" that Josh Roy and Felicia Hanks were also involved in the sale of narcotics, and he was provided further information regarding the location of the residence at issue. (Id.).

Officer Heyer noted that the residence was located and "observed correct as per the information" provided by both the family and the concerned citizen. (Id.). Officer Heyer attested that due to the information he would be moving forward with the information "in order to secure a warrant for the arrest of" Defendant.

On March 29, 2015, Red Lake Tribal Judge, Austin J. Needham, determined that probable cause supported the issuance of the search warrant for the property now at issue. (Id.). That search warrant authorized a search for controlled substances possessed without authority; primary containers used to store, preserve, or conceal controlled substances and proceeds thereof; documents showing the source of supply and profits from the sale or distribution of controlled substances and other written materials tending to establish the existence of drug transactions; firearms; electronic equipment containing information tending to establish the existence of drug transactions; profits and proceeds from narcotics transactions; photographs and videotapes maintained by the suspect which chronicle and record co-conspirators, assets, drug usage, and drug transactions; containers that may conceal or keep safe items of contraband; and

Defendant Damien Jones. (<u>Id.</u>). The warrant also provided the officers with the authority to photograph the above described items and to seize and arrest Defendant Damien Jones. (<u>Id.</u>).

On March 29, 2015, five Red Lake Police Officers, including Sergeant Harlan Johnson ("Sgt. Johnson"), Patrol Officer Jamus Viet ("Officer Viet"), Patrol Officer Ron Leyba ("Officer Leyba"), and Criminal Investigator Paul Smith ("CI Smith"), were called to the Red Lake Police Department to be briefed regarding the execution of a search warrant at the residence described in the search warrant ("Roy Residence"). (August 29, 2016, Motions Hearing, Digital Recording at 2:35–2:36 p.m.). The officers at the briefing were advised that the reasons for the warrant were that Defendant had a federal probation violation arrest warrant and to search for narcotics in the target residence. (<u>Id.</u> at 2:35–2:37 p.m.). The officers were also informed that other officers had been provided information that Defendant was residing at the Roy residence and that the sale of narcotics was transpiring at said residence. (<u>Id.</u> at 2:05–2:06 p.m.).

Sgt. Johnsons was assigned to take photographs, secure evidence, and advise everyone in the residence of their rights. (<u>Id.</u> at 2:05–2:07 p.m.). Officer Viet was assigned to be the second officer in the door and after the warrant execution to transport persons to the Red Lake jail, if necessary. (<u>Id.</u> at 2:35–2:38 p.m.).  After the briefing, the officers headed to the Roy Residence. (<u>Id.</u> at 2:07–2:08 p.m.).

Officer Leyba knocked on the door of the residence, and then both Officer Leyba and Officer Viet announce "police, search warrant." (<u>Id.</u> at 2:37–2:38 p.m.). Officer Leyba made first entry followed by Officer Viet. (<u>Id.</u>). Upon entry, both officers loudly announced "police, search warrant." (<u>Id.</u>). The officers then observed two males exit from the back left bedroom into the hallway of the residence. (<u>Id.</u> at 2:38–2:39 p.m.). The officers ordered the two males to the ground, and the males complied. (<u>Id.</u>). Other officers on the scene secured the two males in

handcuffs. (Id.). After the two individuals were secured, Officer Viet continued to clear the house by going room to room, including the room the two men exited from, to ensure that no other individuals were in the residence. (Id. at 2:39–2:40 p.m.). In the room the individuals exited from, Officer Viet observed firearms in a laundry basket. (Id. at 2:39–2:40 p.m.). After Officer Viet finished his protective sweep of the home, he returned to his patrol car. (Id. at 2:40–2:42 p.m.).

Sgt. Johnson was also at the residence when the search warrant was being executed, but he was not one of the first officers into the residence. When Sgt. Johnsons arrived at the residence, the other officers were conducting the initial knock. (Id. at 2:08–2:10 p.m.). Sgt. Johnson exited his vehicle and turned on his vehicle's emergency lights. (Id.). Sgt. Johnson thought he heard the sound of glass breaking, so he started toward the residence, and he heard the other officers advising "search warrant, get on the ground." (Id.). When Sgt. Johnson entered the residence, the two individuals were on the ground. (Id. at 2:09–2:10 p.m.). The individual on the ground closest to the officers was later identified as Defendant. (Id. at 2:10–2:11 p.m.).

After the individuals had been handcuffed, Sgt. Johnsons helped Defendant stand, walked him to the living room, shackled him, and advised him that the officers were there due to a search warrant for his body and for drugs. (Id. at 2:11–2:13 p.m.). Sgt. Johnson also advised Defendant of his rights pursuant to Miranda. (Id.). The other male individual was escorted out of the residence by another officer. Sgt. Johnson then assisted in clearing the residence, while another officer took Defendant to a patrol car. (Id.). No one else was found in the residence. (Id.). However, Sgt. Johnson testified that, when he was clearing the residence, he observed a substance he believed to be heroin on a plate and some ammunition on the bed in one of the rooms. (Id. at 2:19–2:20 p.m.).

5

After the residence was secured, Sgt. Johnson went out to the other patrol car and advised the other male individual of his rights. (Id. at 2:13–2:15 p.m.). That individual identified himself as Charles Kingbird, but he did not agree to talk with Sgt. Johnson. (Id. at 2:14–2:15 p.m.).

Sgt. Johnson then went to speak with Defendant who was in a separate patrol car. (Id.). Sgt. Johnson asked Defendant the identity of the other individual in an attempt to verify the name he was given, and Defendant asked to make arrangements to have his vehicle, which was located at the residence, picked up. (Id. at 2:14–2:16 p.m.). This interaction between Sgt. Johnson and Defendant lasted less than a minute, and Sgt. Johnson observed that Defendant was cooperative, tracked the questions being asked of him, and did not appear under the influence of in intoxicants. (Id. at 2:17–2:18 p.m.).

Sgt. Johnson then returned to Kingbird, advised him of his rights, and asked if he wished to speak with Sgt. Johnson. (Id.). Kingbird decline to speak with Sgt. Johnson. (Id.).

Sgt. Johnson again returned to Defendant. (Id.). Sgt. Johnson advised Defendant that he had already been advised of his rights and asked if Defendant wished to waive his rights and speak with Sgt. Johnsons. (Id. at 2:18–2:19 p.m.). Defendant agreed to speak with Sgt. Johnson. (Id.). Sgt. Johnson testified that Defendant was again very cooperative, appeared to track the questions he was asked, and did not appear to be under the influence of any intoxicants. (Id. at 2:19–2:20 p.m.). Sgt. Johnson asked Defendant what the officers were going to find in the residence, and Defendant replied that there was some "product" on a plate in his room for Defendant's personal use, and he told Sgt. Johnson that his bedroom was the room straight down the hallway. (Id.).

The three interactions Sgt. Johnson had with Defendant were not recorded. (Id. at 2:20–2:21 p.m.). Sgt. Johnson does not carry a digital recorder, and the recorder in the patrol car where

Defendant was located was broken. (Id.; Id. at 2:25–2:27 p.m.). Sgt. Johnson advised Defendant of his rights from memory, and he did not have Defendant sign a waiver of rights form. (Id. at 2:29–2:31 p.m.).

After this last interaction with Defendant, Sgt. Johnson went back into the residence to complete a video walk through and begin processing the residence. (Id. at 2:21–2:22 p.m.). During that walkthrough, Sgt. Johnson again observed the plate of suspected heroin and ammunition in the room described as Defendant's, and he observed firearms in a laundry basket in another room on the left of the hallway. (Id. at 2:21–2:22 p.m.).

Later, another officer brought Defendant, in handcuffs, to Officer Viet's patrol car and secured Defendant in the back seat of the car while Officer Viet remained in the front seat. (Id. at 2:41–2:42 p.m.). After Defendant was secured in the back seat, Officer Viet began transporting him to the Red Lake jail. (Id. at 2:42–2:43 p.m.). Officer Viet testified that there was a plexiglass divider without holes between the front and back seats, but he also testified that you could hear through the divider. (Id. at 2:47–2:48 p.m.; 2:52–2:53 p.m.).

At some point during transportation, Officer Viet heard Defendant state that, "I should have grabbed a gun and had you guys shoot me." (Id. at 2:43–2:44 p.m.). Officer Viet testified that Defendant may have said other things during the transport, but he did not remember them. Officer Viet testified that this particular statement was memorable because of the guns Officer Viet had previously observed in the Roy Residence. (Id. at 2:44–2:45 p.m.). Officer Viet testified that he did not respond to Defendant's statement, that he did not say anything to Defendant to illicit the statement, and that he did not remember saying anything to Defendant during the transportation. (Id. at 2:43–2:45 p.m.).

The transportation of Defendant was not recorded. (Id. at 2:46–2:47 p.m.). Officer Viet's patrol car is equipped with a recorder, but it was not functional at the time of the transportation. (Id.).

On November 15, 2015, Special Agent Jason Wambach, applied for a federal search warrant seeking permission to secure a DNA buccal swab from Defendant, as well as, to complete hand and fingerprint impression belonging to Defendant. (Gov't's Ex. 2).[4] The affidavit supporting that application for a federal search warrant was based, in large part, on the results of the March 29, 2015, search of the Roy Residence. (Id.). On November 15, 2015, the Honorable Jon Huseby determined that probable cause supported the issuance of the search warrant, and the warrant was signed and issued. (Id.).

## II.   DEFENDANT'S MOTION TO SUPPRESS SEARCHES AND SEIZURES. [Docket No. 22].

Defendant moves the Court for an order suppressing any evidence obtained as a result of the March 29, 2015, search warrant, including the seizure of Defendant himself, and the November 10, 2015, federal search warrant. (Def.'s Mot. to Suppress Searches and Seizures [Docket No. 22]). Defendant's only argument regarding the November 10, 2015, search warrant is that if the March 29, 2015, search warrant is suppressed, then the November 10, 2015, search warrant must be suppressed under the fruit of the poisonous tree doctrine.

### A.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV.

---

[4] Government's Exhibit 2 is the search warrant application, the supporting affidavit, and the warrant itself. At the motions hearing, the Government offered, without objection, the search warrant application, the supporting affidavit, and the warrant itself as Government's Exhibit 2.

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09–cr–239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in Wiley). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial

basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

**B. Analysis**

In the present case, in his affidavit in support of the Tribal search warrant application, Officer Heyer stated that on March 20, 2015, he had been advised "by family" that Defendant had a federal arrest warrant, that Defendant was residing with Joshua Roy and Felicia Hanks, and that Defendant was selling narcotics out of a side window to that residence. (Gov't's Ex. 1). Officer Heyer further attested that on March 24, 2015, he was advised "by a concerned citizen" that Josh Roy and Felicia Hanks were also involved in the sale of narcotics, and he was provided further information regarding the location of the residence at issue. (Id.). Officer Heyer noted that the residence was located and "observed correct as per the information" provided by both the family and the concerned citizen. (Id.). Officer Heyer attested that, due to the information received, he would be moving forward with the information "in order to secure a warrant for the arrest of" Defendant. Officer Heyer also attached Defendant's federal arrest warrant to his application for a Tribal search warrant. (Id.). His application sought a warrant providing authority to search the residence at issue and to arrest Defendant. (Id.).

The Court first considers whether the information from the two sources provided "by family" and the "concerned citizens," if reliable, and along with the attached Federal Arrest Warrant, would have provided the issuing Tribal Judge with a substantial basis on which to conclude that probable cause existed to issue the search warrant.

Possession of a controlled substance is a crime. 21 U.S.C. § 884(a). Accordingly, assuming the information provided by the two sources was reliable, the information that Defendant had been selling narcotics was sufficient to provide a substantial basis on which the

issuing Tribal Judge could conclude that probable cause existed to believe that Defendant had been committing a crime. Further, the previously issued federal arrest warrant attached to the Tribal search warrant application was sufficient to provide a substantial basis on which the issuing Tribal Judge could conclude that probable cause existed to arrest Defendant. Accordingly, upon reviewing the totality of the circumstances, the Court concludes that, if the representations of the two sources were reliable, Officer Heyer's affidavit in support of the application would have provided the issuing Tribal Judge with a substantial basis on which to conclude that probable cause existed to issue a search warrant authorizing the search of the Roy residence at issue and the arrest of Defendant.

Defendant, however, contends that Officer Heyer's affidavit in support of the application for the warrant did not contain sufficient information to establish that the two sources were in fact reliable.

"Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir.1993)). Key to the present motion is the fact that "[e]ven the corroboration of minor, innocent details can suffice to establish probable cause." United States v. Buchanan, 574 F.3d 554, 562 (8th Cir. 2009) (quoting United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001)).

In the present case, Officer Heyer's affidavit in support of his application for the search warrant contained no indication that either of the sources had previously provided reliable information in the past. Accordingly, the Court must determine whether law enforcement

corroborated the information provided by the sources so as to render the information received reliable.

"If [some] information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." Williams, 10 F.3d at 593–94 (citations omitted). In this case, Officer Heyer was able to independently corroborate some of the most significant information provided by the informants, e.g., that Defendant had an active federal warrant for his arrest. Moreover, some of the information provided "by family" related to drug sales was corroborated by the information later provided separately "by concerned citizens." Officer Heyer was informed on two separate occasions, by at least two separate persons, that the sale of narcotics was occurring at the Roy residence at issue. Officer Heyer was also able to independently corroborate the location of the residence identified by both sources.

Because Officer Heyer was able to corroborate some of the information provided by the two sources, the issuing Tribal Judge had a substantial basis on which to infer that other information provided by the sources was also reliable. Id. Accordingly, the Court concludes that the issuing Tribal Judge had a substantial basis on which to conclude that the information provided by the two sources was reliable and that probable cause existed to issue the Tribal search warrant.

In addition, assuming solely for the sake of argument that Officer Heyer's affidavit in support of the application for the search warrant had not been sufficient to establish probable cause, the Court concludes that the officers relied in good faith on the probable cause determination by the issuing Tribal Judge when executing the search warrant.

Although evidence obtained as a result of the execution of a warrant that was not supported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), "there is an exception for evidence obtained by an officer who relied in objective good faith on a search warrant." United States v. Koons, 300 F.3d 985, 990–91 (8th Cir. 2002) (citing United States v. Leon, 468 U.S. 897, 922 (1984)).

"Under the Leon good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citing United States v. Leon, 468 U.S. 897, 898 (1984)).  Even if the Court were now to conclude that Officer Heyer's affidavit in support of the application for the search warrant had not set forth facts within its "four corners" sufficient to demonstrate probable cause to authorize the search of the Roy Residence, on the present record, law enforcement's good-faith reliance on the search warrant ultimately issued by the Tribal Judge militates against suppressing any evidence obtained as a result of the execution of the search warrant. See Leon, 468 U.S. at 919–21 (exclusionary rule does not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope"). See also United States v. Johnson, 219 F.3d 790, 791 (8th Cir. 2000) ("Even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed.").

The Court's review of Officer Heyer's affidavit indicates that he had been notified that Defendant had a federal arrest warrant, that Defendants along with Josh Roy and Felicia Hanks were selling narcotics out of the Roy home, and the location of residence described had been

confirmed. In addition, before the warrant was issued, Officer Heyer had corroborated portions of the information that had been provided by the informants, e.g., the existence of an active Federal Arrest Warrant for the Defendant and the location of subject residence.

Defendant argues that the <u>Leon</u> good faith exception does not apply to the facts of the present case because the Tribal Judge was not qualified to make a probable cause determination, and therefore, was not qualified to issue the March 29, 2015, search warrant presently at issue. Defendant does not argue that Tribal Judge Needham was unqualified per the standards set forth by the Red Lake Tribal Government. Instead, in support of his argument, Defendant reasons that the Tribal Judge here is not qualified because he does not possess a Juris Doctorate, and his qualifications do not mirror the qualifications of a Federal Magistrate Judge or a State Court Judge. Defendant's argument is without merit.

The Supreme Court, in <u>Shadwick v. City of Tampa</u>, rejected the argument that issuing magistrates must be a judge or even a lawyer and required only that a magistrate be "neutral and detached." 407 U.S. 345 (1972).[5] The Court acknowledged that a judge or lawyer would "normally provide the most desirable review of warrant request," but it declined to adopt such a rule, in part, because of the plural and diverse nature of our federal system. <u>Id.</u> at 353. The qualifications of a "magistrate" are, therefore, "inextricably intertwined" with the law of the issuing court. <u>See</u> <u>United States v. Master</u>, 614 F.3d 236 (6th Cir. 2010). Defendant argues that the Supreme Court somehow changed this standard in <u>Leon</u>, 468 U.S. 897, with its continued use of the word "magistrate." This is simply not the case.

---

[5] The Supreme Court in <u>Shadwick</u> noted that defendant there, as in the case now before the Court, was unduly focused on the word "magistrate," when in fact the Fourth Amendment's concern was the broader requirement of a "neutral and detached magistrate," a provision that is satisfied by the issuance of a warrant by any individual outside of the executive branch who is not involved with law enforcement. <u>Id.</u> at 349–52.

Courts after <u>Leon</u>, applying <u>Shadwick</u>, have continued to hold that a lack of legal training was an insufficient reason to determine that an individual would be unable to determine probable cause. <u>See</u> <u>United States v. Neering</u>, 197 F. Supp. 2d 620, 624–26 (E.D. Mich. 2002). <u>See</u> <u>also</u> <u>United States v. Lucas</u>, 499 F.3d 769, 775 (8th Cir. 2007) ("The Constitution generally requires that 'someone independent of the police and prosecution' review a warrant application."). There is no requirement that magistrates have formal legal training. <u>Neering</u>, 197 F. Supp. 2d at 625 (citing <u>Shadwick</u>, 407 U.S. at 350–51).

Further, the United States Supreme Court has long observed that Indian tribes are "distinct, independent political communities, retaining their original natural rights in matters of local self-government." <u>Santa Clara Pueblo v. Martinez</u>, 436 U.S. 49, 55 (1978) (internal quotation marks omitted). While "no longer possessed of the full attributes of sovereignty," tribes retain the right to make their own law regarding internal matters, and to enforce that law in their own forums. <u>Id.</u> at 55–56.[6]

As such, issues surrounding the initial and continuing validity of service as a Red Lake Tribal Judge and that Judge's authority are internal tribal matters which involve construction of tribal law. <u>See</u> <u>Conroy v. Frizzell</u>, 429 F. Supp. 918, 924 (D.S.D. 1977), <u>aff'd sub nom.</u> <u>Conroy v. Conroy</u>, 575 F.2d 175 (8th Cir. 1978). Only a Tribal Government possesses the power to dictate the qualifications required to be a Tribal Court Judge. Defendant here presents no argument that Judge Needham is not qualified under the standards set forth for a Tribal Judge by the Red Lake Tribal Government.

---

[6] The general rule is that one sovereign cannot compel enforcement of their law on another sovereign's officers. <u>See</u> <u>Printz v. United States</u>, 521 U.S. 898, 917, (1997). "Not only is there no general duty for a tribal government to enforce a state government's laws, but our federal system in many instances even prohibits tribal government officers from enforcing state and federal laws." <u>Doe v. Piper</u>, No. 15-cv-2639 (JRT/SER), 2016 WL 755619, at *11 (D. Minn. Feb. 25, 2016).

Moreover, Federal Court's continue to recognize that the authority of non-federal judge's to issue arrest and search warrants is evaluated upon a review of the qualifications set forth in the court in which the issuing individual presides. For instance, Federal Courts have recognized "[a] state is allowed to determine when a person is authorized to approve warrants, where that person has the authority to approve warrants, and what type of warrants that person is allowed to approve." Master, 614 F.3d at 241. Federal courts recognize that "to hold otherwise would allow federal courts to completely undermine state determinations of who is an authorized magistrate, and it is beyond question that we determine who is a qualified magistrate by consulting state law." Id. This is true even in state's which do not require state level magistrates to be attorneys or legally trained. United States v. Bryant, No. 4-cr-47, 2005 WL 2739168, at *3 (W.D.Va. Oct. 24, 2005) (holding that defendant's argument that a magistrate who issued a warrant lacked authority to do so because Virginia law does not require magistrates to be lawyers or have any law school education was without merit as the Fourth Amendment contains no such requirement). There is no reason to treat tribal governments differently from state governments in this regard.

The Supreme Court has also continued to recognize that "search warrants long have been issued by persons who are neither lawyers nor judges, and who certainly do not remain abreast of each judicial refinement of the nature of 'probable cause.'" Illinois v. Gates, 462 U.S. 213, 235 (1983) (citing Shadwick. 407 U.S. at 348–50). The Supreme Court has shown no indication of reversing this long-standing line of jurisprudence. As such, there is no requirement that the Tribal Judge issuing the warrant in the present case possess a Juris Doctorate.

Accordingly, on the present totality of the circumstances, it cannot be said that the executing officers unreasonably relied on the search warrant issued by the Tribal Judge.

Lastly, even assuming arguendo that the application for the search warrant lacked sufficient probable cause and that the good faith exception did not apply to the March 29, 2015, warrant, the Court would still recommend that the evidence obtained as a result of the March 29, 2015, search of the Roy residence not be suppressed. While not addressed by the Defendant, it is undisputed in the present case that there was a separate Federal Arrest Warrant issued authorizing the arrest of Defendant.

That federal arrest warrant alone when based on the information received by law enforcement that Defendant was staying in the Roy residence gave Judge Needham probably cause to issue a Tribal warrant authorizing the arrest of Defendant at the Roy residence. Those warrants, alone or in combination, gave officers the right to enter the Roy residence to arrest Defendant.

The Supreme Court has stated that, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is <u>reason to believe</u> the suspect is within." <u>Payton v. New York</u>, 445 U.S. 573, 603 (1980) (emphasis added). If officers are unsure if the subject of the arrest warrant resides in the home, courts allows "police entry if the arresting officer executing the arrest warrant at [a] third person's home have a *reasonable belief* that the suspect resides at the place to be entered and have reasons to believe that the suspect is present at the time the warrant is executed." <u>United States v. Powell</u>, 379 F.3d 520, 523 (8th Cir. 2004) (emphasis in original). Whether the officers had reasonable belief is based upon the "totality of the circumstances" known to the officer prior to entry. <u>See</u> <u>United States v. Junkman</u>, 160 F.3d 1191, 1193 (8th Cir. 1998).

17

In the present case, Officer Heyer was advised "by family" that Defendant had a Federal Arrest Warrant out for him and that he resided at the Roy residence at issue, and he confirmed the accuracy of the information received regarding the Federal Arrest Warrant and "observed [as] correct" the location information he was given. Officer Heyer then applied for a tribal warrant, and subsequently all the officers who would be participating in the execution of the warrant were briefed on the information Officer Heyer had received. The officers clearly had a reasonable belief that Defendant was residing at the Roy residence now at issue. Further, given the "totality of the circumstance," including the information from two different sources that Defendant and others were allegedly selling narcotics out of the residence, and Officer Heyer's observation confirming the location of the residence, the officers had reason to believe Defendant was inside the residence.

"While in general, an arrest does not justify a full-blown search of the arrestee's home . . . the Supreme Court has held that officers may conduct a limited protective sweep following an in-home arrest if they have a 'reasonable belief based on <u>specific and articulable facts</u> that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" <u>United States v. Gallegos</u>, 430 F. Supp. 2d 915, 925–26 (D. Minn. 2006) (emphasis added). In other words, a protective sweep of a home requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." <u>Maryland v. Buie</u>, 494 U.S. 325, 334 (1990). The basis for allowing officers to conduct a protective sweep in these circumstances comes from the "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." <u>Id.</u> at

333; United States v. Cash, 378 F.3d 745, 747–48 (8th Cir. 2004). At least part of the reason for justifying a protective sweep comes from the fact that "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Buie, 494 U.S. at 333. Addressing the permissible scope of a protective sweep, the Eighth Circuit has held that a protective sweep of an upstairs bedroom was reasonable, even though the suspect had been handcuffed and taken downstairs, because marshals had no way of knowing how many people were in house when they entered it, the search was quick and limited, and it was initially confined to places large enough to conceal a person. United States v. Boyd, 180 F.3d 967, 975–76 (8th Cir.1999).

In the present case, the officers were aware that information had been provided that up to four individuals may have been involved in the sale of narcotics from the residence where the officers were arresting Defendant, but they had no way of determining exactly how many people were in the residence at the time the search warrant was executed. Upon entry, the officers immediately found only two individuals, and they then performed a protective sweep to ensure no one else was in the house. Moreover, the officers reasonably believed that the house was involved in narcotics transactions and they could infer the occupants might be armed. See United States v. Gallegos, 430 F. Supp. 2d 915, 926 (D. Minn. 2006). During the performance of the protective sweep, Officer Viet observed, then in plain view, firearms in a laundry basket, and Sgt. Johnson observed a plate containing what he believed to be heroin on a bed, as well as, a box of ammunition.

Under the plain view doctrine, a law enforcement officer is permitted to seize evidence without a warrant when: "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character

19

is immediately apparent, and (3) the officer has a lawful right of access to the object itself." United States v. Armstrong, 554 F.3d 1159, 1162–63 (8th Cir. 2009), cert. denied, 129 S.Ct. 2805 (2009); see Horton v. California, 496 U.S. 128, 136–38 (1990).  As discussed above, the officers did not violated the Fourth Amendment when they performed the protective sweep and initially located the firearms, ammunition, and suspected narcotics; moreover, during that protective sweep, the officers limited their intrusions to locations which a person could possibly be found, i.e., the bedrooms. The incriminating nature of the firearms, ammunition, and narcotics was apparent to the officers immediately upon viewing them, which the officers were able to do without looking inside of or opening any compartments. See, e.g., United States v. Boyd, 180 F.3d 967, 975 (8th Cir. 1999) (determining that the plain view doctrine applied to render admissible items officer "associated with illegal drug use" including drug scale, currency, and plastic bag of white powder); Texas v. Brown, 460 U.S. 730, 740 (1983) (quoting Payton, 445 U.S. at 587 ("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.")).

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Searches and Seizures. [Docket No. 22].[7]

## III.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS. [DOCKET NO. 23].

Defendant moves the Court for an order suppressing statements he made on March 29, 2015. (See Def.'s Mot. to Suppress Statements [Docket No. 23]). Defendant originally

---

[7] As noted above, Defendant also challenges the November 15, 2015, federal search warrant. However, as his sole argument in support of that challenge, Defendant asserts that the evidence obtained from the November 15, 2015, warrant should be suppressed as it was tainted as poisonous fruit of the initial March 29, 2015, search. As discussed above, however, the Court finds that the March 29, 2015, warrant was based on sufficient probable cause. Therefore, to the extent Defendant's motion seeks to suppress the evidence obtained as a result of the November 15, 2015, search warrant, the Court also recommends Defendant's Motion to Suppress Searches and Seizures, [Docket No. 22], be **DENIED**.

challenged three groups of statements he made on March 29, 2015: (1) an identification statement he made in the residence; (2) the statements he made to Sgt. Johnson while Defendant was waiting in a patrol car, and (3) the statement he made to Officer Viet while he was being transported to the Red Lake jail. However, at the motions hearing, Defendants withdrew his motion as to the identification statement he made in the residence. (August 29, 2016, Motions Hearing, Digital Recording at 1:59–2:01 p.m.).

In support of his motion to suppress the March 29, 2015, statements, Defendants contends that his statements were "tainted by the illegal search, and must be suppressed for that reason alone." (Def.'s Mem. in Support, [Docket No. 34], at 12).[8]

### A.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those

---

[8] Defendant also asserts that under Minnesota state law, in Minnesota state courts, the statements would be suppressed because the statements were not recorded. While not expressly asking the Court to adopt such a law, to the extent Defendant asks the Court to issue a ruling of "bold nuance" that "where technology is readily available and there is an intentional decision not to memorialize what is said, the evidence is indistinct and not worthy of belief[,]" the Court declines to do so. (Def.'s Mem. in Support, [Docket No. 34], at 12–13). The state rule of procedure is not binding on this Court, and the Defendant's statement that an intentional decision was made not to record his statements is contradicted by the record. Defendant's statements in Sgt. Johnson's squad car and Officer Viet's squad car were not recorded because the necessary equipment in both of the vehicles was not operational at that time and in need of service.

normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant may waive his rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B. Analysis

In his memorandum in support of his motions to suppress, Defendant does not allege that any officer failed to provide him with a Miranda warning. (Def.'s Mem. in Support, [Docket No. 34], at 12–13). Moreover, Defendant does not argue that he did not waive his rights pursuant to Miranda. (Id.). Instead, Defendant contends only that his statements must be suppressed as they are tainted by the March 29, 2015, search. (Id. at 12).

However, the Court has already determined above that the March 29, 2015, search was not an illegal search as alleged by Defendant.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Statements. [Docket No. 23].

## IV.   DEFENDANT'S MOTION FOR DISCLOSURE OF INFORMANTS. [Docket No. 21].

Defendant asks the Court to order the Government to disclose the identity of any informants used by the Government in its investigation of the present case, including the two sources referenced in Officer Heyer's affidavit supporting the application for the Tribal search warrant at issue above. (Def.'s Mot. for Disclosure of Informants [Docket No. 21]). Additionally, Defendant asks for the government to disclose all informant documentation, notes, contracts, and incentives, and make such informants available for interview. (Id.).

The Government has the benefit of a privilege "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. 53, 59 (1957) (citations omitted). There are several exceptions to the privilege. Id. Of those, the one pertinent to the present case takes into account the "fundamental requirements of fairness" and a defendant's need to prepare an adequate defense. See Id. at 60–61 ("Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.").

"[T]here is no litmus test for determining when disclosure [of an informant's identity] is required[.]" United States v. Lapsley, 334 F.3d 762, 764 (8th Cir. 2003); see also Roviaro, 353 at 62 ("We believe that no fixed rule with respect to disclosure is justifiable."). However, the Eighth Circuit has indicated a court ruling on a motion for disclosure of an informant's identity "must weigh the defendant's right to information against the government's privilege to withhold the identity of its confidential informants." Lapsley, 334 F.3d at 763–64 (internal quotation marks and citations omitted).

In the present case, the Court concludes that the balance is best served by requiring the Government to disclose to Defendant the identity of any informant whose testimony the Government intends to introduce at trial in the present case or whose identity is otherwise discoverable under Brady, Giglio, and their progeny, or the Government's other statutory discovery obligations. The Government will not be required to disclose the identity of any informant whose testimony it does not intend to introduce at the trial in the present case, unless the informant's identity is otherwise discoverable under the Government's other discovery obligations.

To the extent that Defendant's motion seeks the disclosure of the identity of confidential informants, the motion is granted in part and denied in part. The Government is not at this time required to disclose the identity of its confidential informants unless the informants' identities are discoverable under <u>Brady</u>, <u>Giglio</u>, and their progeny, or the Government's other discovery obligations. In the event that the Government determines that it will use any confidential informants as witnesses at trial, the Government shall disclose the identity of those informants to the Defendant and make those informants available for interview as soon as practicable and in no event later than seven (7) days before trial.

## V.     CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Disclosure of Informants, [Docket No. 21], is **GRANTED in part** and **DENIED in part**.


**IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Suppress Evidence of Searches and Seizures, [Docket No. 22], be **DENIED**; and

2. Defendant's Motion to Suppress Statements, [Docket No. 23], be **DENIED**.


Dated: October 3, 2016                                        _s/ Leo I. Brisbois_____
                                                                          Leo I. Brisbois
                                                                          U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.